IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

GARY PIERRE JOSEPH, )
)
   Plaintiff, )  Civil Action No. 7:22-cv-00019
)
v. )  **MEMORANDUM OPINION**
)
ALEXANDER S. MOORE, )  By: Hon. Thomas T. Cullen
)    United States District Judge
   Defendant. )

Plaintiff Gary Pierre Joseph ("Joseph") brought this civil rights action alleging that Defendant Alexander S. Moore ("Moore"), a Roanoke County police officer, illegally seized, searched, assaulted, battered, arrested, and imprisoned him on the evening of June 18, 2021. Before the court is Moore's motion for summary judgment. Having reviewed the record and the parties' briefings, the matter is ripe for decision.[1] Because Moore had reasonable suspicion to detain Joseph and his use of force to effectuate the detention was reasonable under the

---

[1] The court dispenses with oral argument because it would not aid in the decisional process. Moreover, the court notes that this case is fraught with procedural issues. Moore's summary judgment motion was initially opposed by Joseph through counsel more than seven months ago. (*See* ECF No. 23.) When it became clear that Joseph's former counsel would withdraw, the court stayed the case from April 24, 2023 until July 31, 2023 on Joseph's motion. (ECF No. 32.) The court did so to give Joseph time to retain new counsel and mediate the case. (*Id.*) The court lifted the stay on August 1, 2023 and, issued a scheduling order for optional supplemental briefing to give Joseph a chance to supplement his opposition to the pending summary judgment motion. (ECF No. 44.) Instead of following the court's scheduling order, Joseph asked for additional time via improper *ex parte* e-mails to court staff. Because Joseph represented that he was "deployed overseas," the court granted his request and extended the deadline to file any supplemental opposition to September 15, 2023. (ECF No. 46.) But as it did so, the court warned Joseph in no uncertain terms that any future *ex parte* communications may result in sanctions, and that the court would not consider or respond to any future e-mails. (*Id.*)

  Despite that admonishment, Joseph again e-mailed the court on September 13, 2023, requesting additional time to file a supplemental response. The court will not consider Joseph's request and instead will decide Moore's motion for summary judgment based on the opposition currently on the record.

circumstances, Moore's motion will be granted in part. But because there is a genuine dispute of material fact as to whether Moore had probable cause to arrest Joseph, Moore's motion for summary judgment will be denied in that respect.

## I.   BACKGROUND

On the evening of June 18, 2021, Joseph purchased flowers from the Kroger store located at 4404 Brambleton Avenue in Roanoke County. (Joseph Decl. ¶ 2 [ECF No. 23-1].) He apparently bought the flowers as a gift for his wife but, knowing that she was "not a big fan of flowers," he asked the cashier whether he could return them for a full refund if she did not like them. (*Id.* ¶ 3.) According to Jospeph, the cashier told him that this would not be a problem and never mentioned any "no return" policy. (*Id.* ¶¶ 3–4.) Joseph's wife evidently did not like the flowers, so Joseph went back to the store a short while later to return them. (*Id.* ¶ 5.) Joseph explained to the customer service clerk, Andrew Sharpe ("Sharpe"), what happened and produced the flowers and his receipt, but Sharpe informed him that Kroger had "the right to change [its] mind" about a return. (*Id.* ¶¶ 6–8.) According to the clerk, Kroger did not accept returns on flowers unless there was something wrong with them. (Sharpe Decl. ¶ 3 [ECF No. 14-1].) The store manager on duty, Alyssa Tillery ("Tillery")—who was also behind the customer-service desk—instead offered Joseph store credit. (Tillery Decl. ¶¶ 2–3 [ECF No. 14-2].) But Kroger's "change of mind[,]" without further explanation, upset Joseph, and he felt that this purported no-return policy was being directed at him "because of [his Black] race and heavy accent." (Joseph Decl. ¶ 9.)

Joseph acknowledged that he "was upset and elevated [his] voice in an attempt to argue [his] case for a refund," but he maintains that he did not threaten or intimidate anyone. (*Id.*)

When the clerk told him that the police were being called, Joseph claims that he was pleased because he thought the officer would intervene and facilitate his cash refund. (*Id.* ¶ 10.)

From Sharpe's perspective, Joseph was "raising his voice, was defensive, agitated, using foul language and behaving in an aggressive manner." (Sharpe Decl. ¶ 3.) Sharpe described the customer-service desk as a high-traffic area and that, as "Joseph continued to raise his voice, use foul language, make demands, and act inappropriately, [Sharpe] noticed customers and employees show[ing] alarm and expressions of being scared." (*Id.* ¶ 4.) Tillery also heard Joseph being "loud, using foul language and demanding a cash refund." (Tillery Decl. ¶ 3.) According to Tillery, Joseph was so loud that another employee "from the back of the building rushed forward out of concern for the situation because he could hear [Joseph's] angry yelling even back there." (*Id.* ¶ 3.) Sharpe felt that Joseph was "trying to intimidate" the Kroger staff. (Sharpe Decl. ¶ 5.) And Joseph made Tillery feel "uncomfortable with [his] yelling demands, intimidation and cursing." (Tillery Decl. ¶ 3.) As manager, Tillery told Joseph to leave out of her concern for the employees—many of whom are minors—and customer safety, but Joseph "refused to leave and would not calm down." (*Id.* ¶¶ 4–5.) As a result of Joseph's "increasingly belligerent behavior and refusal to leave," Sharpe called 911 and told the dispatcher that they "had a very belligerent customer and . . . needed a police officer to escort him out." (Sharpe Decl. ¶ 5.) Sharpe also reported to the 911 dispatcher that the situation was not physical "at the moment, but it could be[come]" physical. (911 Call [ECF No. 26-1].)

Moore received a call from dispatch that there was a "disturbance" at Kroger, and the dispatcher added that she could "hear the suspect yelling in the background during the 911 call." (Moore Decl. ¶ 2 [ECF No. 14-3].) Further, the six Kroger surveillance videos

("Videos")[2]—which, though silent, clearly depict some of the actions at issue—also show an agitated Joseph waving his hands around.

As soon as Moore arrived and entered Kroger, he says he could hear a male speaking loudly. (Moore Decl. ¶ 3.) When he arrived at the customer-service desk, he recognized the loud voice as belonging to an individual later identified as Joseph. (*See id.* ¶¶ 4, 9.) According to Moore, Joseph continued to speak loudly and claim that Kroger would not give him a refund "because he was black." (*Id.* ¶ 5.) Moore stepped in to speak with Joseph, planning to investigate by asking Joseph and Kroger employees questions. (*Id.* ¶ 6.) Joseph "continued to speak loudly and was being demonstrative, gesticulating with his hands and raising them towards [Moore's] face." (*Id.*). Moore "stepped to the side so that [he] could maintain a safe distance from" Joseph and told him to stop yelling. (*Id.*) For his part, Joseph claims that Moore's "attention was totally directed at [Joseph] with a confrontational attitude." (Joseph Decl. ¶ 11.) According to Joseph, upon realizing that Moore "had no intention to intervene on [Joseph's] behalf," he picked up his wallet and flowers receipt and began walking toward the exit to leave the store. (*Id.* ¶ 12.)

It is uncontested that, at this point, Moore demanded Joseph stop and produce his driver's license for identification, but that Joseph did not stop. (Moore Decl. ¶ 7; Joseph Decl. ¶ 13.) Based on the information relayed by dispatch and his personal observations, Moore believed that Joseph's conduct was disorderly, that Joseph was causing a disturbance, and that

---

[2] There are six clips of Video footage, labeled with descriptors of the locations that each of them captures at the relevant times: (1) "Entry," (2) "Register," (3) "Customer Care," (4) "Customer Care 2," (5) "Smart Safe," and (6) "Exit." The Videos were referenced in both parties' briefs, and Moore provided the court with a flash drive containing all six Videos. (*See* ECF Nos. 26-1, 27.)

Moore had reasonable suspicion to detain Joseph to investigate further. (Moore Decl. ¶ 7.) When Moore told Joseph to produce his driver's license, Joseph responded that he did not need to provide identification and kept walking toward the exit without producing it. (*Id.* ¶¶ 7–8.) Moore says that when he demanded, for a second time, that Joseph provide his ID, Joseph asked, "Why?" but did not comply; instead, he "ignored [Moore's] commands and continued walking." (*Id.*) Joseph agrees that he asked "Why?" but denies that he refused to produce his ID. (Joseph Decl. ¶ 13.) Moore claims that he responded to Joseph's *why* inquiry by telling him that Moore "was there for a lawful reason, that [he] was called due to a report of a disturbance, and that [he] would need to identify [Joseph]." (Moore Decl. ¶ 7.) Moore then grabbed Joseph's arm to stop him from leaving. (*Id.* ¶ 8.) According to Moore, Joseph stopped, turned around and loudly argued with Moore, still refusing to provide his ID. (*Id.* ¶ 8; *see generally* Videos.) Moore perceived that Joseph kept "making demonstrative hand gestures" and "continued to act in a belligerent, unpredictable manner." (Moore Decl. ¶ 8.)

Joseph asserts that Moore put him "in a wrist lock and then escalat[ed] the pressure being applied to [his] wrist and then to [his] elbow[,] which resulted in . . . extreme pain and complete immobilization." (Joseph Decl. ¶ 14.) Moore's actions, Joseph claims, caused "physical injuries to [his] body and severe emotional distress[,] which has required counseling." (*Id.* ¶ 16.) According to Moore, because Joseph had ignored his repeated orders to provide his ID, tried to walk away, and passively resisted his attempt to stop him, Moore "placed [Joseph's] left arm behind his back in a rear wrist lock[,]" intending to handcuff Joseph "so [he] could complete [his] investigation safely." (Moore Decl. ¶ 8.) Moore claims that Joseph actively resisted by straightening his left arm, and Moore responded with a standard compliance

technique of applying pressure to Joseph's elbow and pulling on his fingers to gain control over him. (*Id.*) Moore successfully gained control of Joseph and handcuffed him. (*Id.* ¶ 9.) He then had Joseph sit on the floor. (Joseph Decl. ¶ 15; Moore Decl. ¶ 9.) According to Moore, Joseph did not complain of injury resulting from the handcuffing. (Moore Decl. ¶ 15.)

At that point in time, Moore claims that he believed he had probable cause to arrest Joseph and that Joseph was under arrest for obstruction of justice because Joseph "had failed to comply with [Moore's] direct order to show his identification during [Moore's] investigation of a potential disturbance, thereby impeding [Moore's] lawful police duties . . . ." (Moore Decl. ¶¶ 8–9.) Moore then searched Joseph and retrieved his wallet from his pocket. (Joseph Decl. ¶ 17; Moore Decl. ¶ 9.) Moore interviewed Tillery, who asked that he be formally barred from the store, and then informed Joseph that he was under arrest. (Moore Decl. ¶¶ 10–12.)

Joseph was then transported to the Roanoke County Jail where Moore presented Joseph to a magistrate. (Joseph Decl. ¶ 19; Moore Decl. ¶ 13). There is some dispute as to what exactly occurred before the magistrate. Joseph claims that Moore initially requested an arrest warrant for disturbing the peace but, after being rebuffed by the magistrate, Moore "falsely claimed that [Joseph] had 'refused' to provide [his] identification when [Moore] requested it in support of a criminal charge of obstruction of a law enforcement officer in the performance of his duties in violation of [Va. Code Ann.] § 18.2-460." (Joseph Decl. ¶¶ 20–21.) Moore states that, as they were waiting for the magistrate, Joseph "began talking about Juneteenth and was trying to appeal to [Moore's] race[,]" asking Moore "to not charge him because [they] were both black." (Moore Decl. ¶ 13.) But Moore declined to "compromise [his] integrity for" Joseph. (*Id.*)  Moore then testified as to what happened to the magistrate,

- 6 -

who found probable cause to issue a warrant for obstruction of justice; Moore then served the warrant on Joseph. (*Id.* ¶ 14.) According to Joseph, the magistrate issued an arrest warrant "solely predicated on the false testimony given" by Moore. (Joseph Decl. ¶ 22.) Moore executed the warrant, but the charge was later dropped by the Commonwealth Attorney. (*See id.* ¶ 24.)

Joseph filed this civil rights action against Moore in the Circuit Court for the City of Roanoke under 42 U.S.C. § 1983 and Virginia law. (*See* Am. Compl. [ECF No. 1-1].) Moore then removed the matter from that court. (*See* Notice of Removal [ECF No. 1].) Specifically, Joseph asserts seven causes of action against Moore:

1.   42 U.S.C. § 1983 – Excessive Force in Violation of the Fourth Amendment
2.   42 U.S.C. § 1983 – False Arrest in Violation of the Fourth Amendment
3.   Common Law Assault
4.   Common Law Battery
5.   Common Law False Imprisonment
6.   Violation of Va. Code Ann. § 19.2-59 – Unlawful Search
7.   Common Law Malicious Prosecution

(Am. Compl.) Moore's Motion for Summary Judgment is now before the court. (*See* ECF No. 13.)[3] Moore argues that, because he had reasonable suspicion to detain Joseph and probable cause to arrest him, his conduct was in all regards lawful. At bottom, the court's summary judgment determination turns on whether, as a matter of law, Moore had (1) reasonable suspicion to detain Joseph and (2) probable cause to arrest Joseph. As explained below, based on the undisputed evidence in the record, the court concludes as a matter of law that Moore had reasonable suspicion to detain Joseph and that his attendant use of force was reasonable.

---

[3] Moore has withdrawn the portion of his motion that sought dismissal for lack of prosecution under Federal Rule of Civil Procedure 41(b). (*See* ECF Nos. 18 & 19.)

But disputed factual issues preclude the court from finding that Moore had probable cause at the time he arrested Joseph. Accordingly, Moore's motion will be granted in part and denied in part.

## II.   STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is

to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

### III.   ANALYSIS

#### A.  Counts 1, 3, 4

Joseph brings three claims related to Moore's use of force on the evening in question. The claims all turn on whether Moore had reasonable suspicion to conduct an investigatory stop and, therefore, whether he had the authority to use reasonable force to detain Joseph. Concluding that Moore possessed reasonable suspicion as a matter of law and that his application of force was reasonable under the circumstances, the court will grant Moore's motion for summary judgment on Counts 1, 3, and 4.

### 1. Count 1 (Excessive Force)

Joseph first brings an excessive force claim under 42 U.S.C. § 1983. Moore argues his use of force in effectuating the stop was reasonable under the circumstances and therefore does not constitute excessive force.

Excessive force claims "are to be evaluated under the Fourth Amendment to the United States Constitution." *Russell v. Wright*, 916 F. Supp. 2d 629, 636 (W.D. Va. 2013). Of course, the Fourth Amendment's protection against "unreasonable seizures includes the right to be free of seizures effectuated by excessive force." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (cleaned up). With that said, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Reasonableness, therefore, is the court's touchstone inquiry. *See Birchfield v. North Dakota*, 579 U.S. 438, 477 (2016); *see also Cnty. Of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017) ("That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim.").

To defeat an excessive-force claim at summary judgment, the moving party must therefore show that both the investigative stop and the force used to effectuate that seizure were reasonable as a matter of law. *See Aleman v. City of Charlotte*, No. 21-2223, 2023 WL 5257679, at *15 (4th Cir. 2023) (citing *Graham*, 490 U.S. at 395–96).

### i. Reasonable Suspicion Supported the Investigatory Stop

"[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). But "an officer may,

consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). An officer has reasonable suspicion when he "possess[es] a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004) (cleaned up). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is . . . less than is necessary for probable cause." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014)).

In determining whether a police officer had reasonable suspicion, the court "look[s] to the circumstances known to the officer and 'the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'" *United States v. Smith*, 396 F.3d 579, 583 (4th Cir. 2005) (quoting *Terry*, 392 U.S. at 27). Even wholly lawful conduct may engender a reasonable suspicion of criminal activity. *See United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) ("Facts innocent in themselves may together amount to reasonable suspicion; officers are permitted to conduct investigative stops based on what they view as suspicious— albeit even legal—activity.") (cleaned up). At bottom, the court's reasonable suspicion inquiry "must consider 'the totality of the circumstances—the whole picture.'" *Smith*, 396 F.3d at 583 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). At this stage, the court considers the evidence in the light most favorable to Joseph.[4]

---

[4] To the extent the Videos are clear, the court "view[s] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). "Where, however, the video does not clearly or blatantly contradict [Joseph's] version of the facts," the court must adopt his version of the facts at summary judgment. *Hupp v. Cook*, 931 F.3d 307, 315 n.3 (4th Cir. 2019) (cleaned up)

At Kroger, Joseph admits he was "upset and elevated [his] voice[,]" but states that he was not "threatening or intimidating in any way . . . ." (Joseph Decl. ¶ 9.) He alleges that he thought the 911 call was made for an officer to come to the Kroger to "investigate the circumstances surrounding the dispute, interview the cashier and learn of the promise of a refund that had been made and facilitate a refund." (*Id.* ¶ 10.) But Moore arrived "with a confrontational attitude[,]" according to Joseph, and after realizing Moore would not intervene on his behalf, Joseph tried to leave the store. (*Id.* ¶¶ 11–12.) In sum, according to Joseph, he may have been speaking loudly, but that alone did not give rise to reasonable suspicion for an investigatory stop.

But the full factual record reveals a much more fraught and complex scenario. Moore asserts, and the video supports, that when he arrived at the store, the Kroger employees and customers "seemed to be nervous about [Joseph's] behavior." (Moore Decl. ¶ 5; *see* Customer Care Video.) When Moore arrived and tried to speak with Joseph, Joseph "continued to speak loudly and was being demonstrative, gesticulating with his hands and raising them towards [Moore's] face[,]" causing Moore to step back. (Moore Decl. ¶ 6; Smart Safe Video.) Moore told Joseph to stop yelling, at which point Joseph began walking toward the exit. (Moore Decl. ¶¶ 6–7.) At that point, Moore believed he had reasonable suspicion that, "based on the report from dispatch and [his] own observations[,]" Joseph was "causing a disturbance and being disorderly . . . ." (*Id.* ¶ 7.)

Ultimately, the undisputed facts confirm Moore's belief that he had the requisite reasonable suspicion of criminal activity to conduct an investigatory stop. Moore arrived at the scene to investigate a disturbance in response to a 911 dispatch about a public disturbance

at the Kroger. His personal observations confirmed that the information received from dispatch was accurate and Joseph was the subject of the 911 call. *See Mitchell*, 963 F.3d at 391 ("Put simply, police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch.") (cleaned up). And once he arrived, Moore, because of Joseph's aggravated demeanor, had to take a step away from Joseph "to maintain a safe distance from him." (Moore Decl. ¶ 6; Smart Safe Video.) In other words, Moore found a scene exactly like the one which he was called to investigate.

Virginia law criminalizes disorderly conduct in public places. Va. Code Ann. § 18.2-415. In reviewing whether Moore reasonably believed Joseph violated that statute in this reasonable suspicion context, the court does not undergo a detailed legal analysis; it must instead "give due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see also United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015) ("Reasonable suspicion is a commonsense, nontechnical standard that relies on the judgment of experienced law enforcement officers, *not legal technicians*.") (emphasis added) (cleaned up). Consistent with what the 911 dispatcher told him, Moore encountered Joseph "yelling and gesturing at nearby" people and himself, and other members of the public "appeared to be concerned by [Joseph's] behavior." *Elliott v. Commonwealth*, No. 1549-09-2, 2010 WL 3463127, at *3 (Va. Ct. App. Sept. 7, 2010) (finding those facts gave an officer reasonable suspicion that violations of Va. Code Ann. §§ 18.2-415 (disorderly conduct) and 416 (abusive language) may have been afoot).

The ensuing events bolster Moore's initial impression. Reasonable suspicion can arise when the suspect of a police dispatch attempts to flee. *See, e.g.*, *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006) (noting that a suspect's attempt to flee from an officer "is the consummate act of evasion[,]" a pertinent factor in the reasonable suspicion calculus). When Joseph walked away, given that he was a suspect, Moore was justified in conducting an investigatory stop. *Cf. Wardlow*, 528 U.S. at 125 ("[W]hen an officer, *without reasonable suspicion* or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.") (emphasis added). In sum, that is enough for reasonable suspicion.

Joseph's contention that Moore did not observe Joseph committing a crime and therefore had no authority to stop Joseph from leaving Kroger is unavailing because it conflates probable cause with reasonable suspicion. Reasonable suspicion of a crime is a lower standard than probable cause. *See Glover*, 140 S. Ct. at 1187. Indeed, reasonable suspicion may be premised on innocent facts if an officer's reasonable perception of the circumstances suggests "suspicious—albeit even legal—activity." *Mitchell*, 963 F.3d at 390. Speaking in a loud voice and walking out of a store is not necessarily illegal, but those actions did not occur in a vacuum. The totality of the circumstances, including Joseph's conduct as described by the 911 dispatcher that preceded those actions, establishes that Moore's suspicion of a crime was reasonable.

Moore "seized" Joseph for Fourth Amendment purposes when he "restrain[ed] his freedom to walk away" by grabbing his arm as Joseph walked from the customer service desk toward the store exit, and then handcuffing him. *Terry*, 392 U.S. at 16. Based on the admissions of the parties and video evidence, the court finds, as a matter of law, that reasonable suspicion

existed and Moore's investigatory stop of Joseph was legal.

### ii. The Use of Force was Reasonable

A lawful investigatory stop necessarily authorizes an officer to use some physical force to effectuate it. *Graham*, 490 U.S. at 396. In determining whether the force used runs afoul of the Fourth Amendment, the court applies an objective reasonableness test. *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Indeed, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (cleaned up). The court must also be mindful that "reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The court applies the three *Graham* factors in considering an officer's alleged use of excessive force in light of the circumstances: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018) (quoting *Graham*, 490 U.S. at 396). Ultimately, the court must make its decision "with an eye toward the proportionality of the force in light of all the circumstances." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (cleaned up).

Joseph contends the force used was excessive essentially because Moore had no right to use force given that Joseph was not under arrest. (Mem. Opp'n Mot. Summ. J. at 4–5 [ECF

- 15 -

No. 23].) Contrary to Joseph's contention, the use of force—even handcuffing a suspect—does not convert an investigatory stop "into an arrest so long as the methods of restraint used are reasonable to the circumstances." *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989). An officer "may handcuff a suspect when 'reasonably necessary to maintain the status quo and protect officer safety during an investigative stop.'" *Young v. Prince George's Cnty.*, 355 F.3d 751, 755 (4th Cir. 2004) (quoting *Crittendon*, 883 F.2d at 329). And the force accompanying a "[p]ainful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002).

As discussed above, Moore had reasonable suspicion to conduct a lawful investigative stop. When Joseph, as the subject of that investigation, attempted to leave the scene, Moore was plainly justified in using a reasonable level of physical force to detain him. The court now considers whether the force used was reasonable applying the *Graham* factors.

First, the severity of the crime was low; at most, Moore suspected Joseph had committed a misdemeanor. *Graham*, 490 U.S. at 396; *see* Va. Code Ann. § 18.2-415 ("A person violating any provision of this section is guilty of a Class 1 misdemeanor."). Second, the threat posed to the officer at that time and others was minimal. *Graham*, 490 U.S. at 396. There may have been some threat—Moore was the only officer at the scene, Joseph's agitated behavior was making other employees and customers nervous, and he was "gesticulating with his hands and raising them towards [Moore's] face"—but there is no allegation that there was any imminent threat of physical danger. (Moore Decl. ¶ 6.) The last factor, though, counsels that Moore was justified in using some force, as Joseph was promptly and actively leaving the scene and did not comply with Moore's order to stop. (Smart Safe Video; Moore Decl. ¶ 8; Joseph

Decl. ¶¶ 12–14.)

Moore's low-level application of force—grabbing Joseph's arm and eventually placing him in handcuffs— was indeed commensurate with the situation. *See Smith*, 781 F.3d at 101. When Joseph—as the subject of a lawful investigation—refused to comply with Moore's order to remain in the store for the investigation and was acting in a "belligerent, unpredictable manner[,]" the physical force used to keep him at the scene was minimal and not greater than necessary to detain Joseph. (Moore Decl. ¶ 8.) And when Joseph pulled away from Moore's grip, Moore was justified in bringing Joseph under control to apply the handcuffs.

Joseph concedes that Moore put him "in a wrist lock" only after he did not comply with Moore's "demand that [he] stop." (Joseph Decl. ¶¶ 13–14.) It is therefore undisputed that Moore started with verbal commands and only escalated to physical force when that became necessary based on Joseph's noncompliance. Even viewing the facts in the light most favorable to Joseph, the court agrees that Moore's use of force was reasonable to effectuate the investigatory stop. (Mem. Supp. Mot. Summ. J. at 10 [ECF No. 14].)

Because the court agrees with Moore that the seizure and use of force were reasonable as a matter of law, it will grant his motion for summary judgment on Count 1.[5]

### 2. Count 3 (Assault) & Count 4 (Battery)

Joseph also brings assault and battery claims under Virginia common law related to Moore's use of physical force on the evening in question. The court's finding that Moore's

---

[5] Moore asserts qualified immunity as an alternative ground on which summary judgment should be granted as to Counts 1, 3, and 4. Because the court finds that Moore prevails on his argument that he had reasonable suspicion as a matter of law, it need not reach the issue of qualified immunity. Even so, the court notes that the result would be the same in a qualified immunity analysis given that Joseph's constitutional right to be free from excessive force was not violated for the same reasons stated herein. *See, e.g., Aleman*, 2023 WL 5257679, at *15.

excessive force claim fails as a matter of law requires that it also grant summary judgment on these corresponding claims: "[P]arallel state law claim[s] of assault and battery [are] subsumed within the federal excessive force claim . . . ." *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Therefore, the court necessarily will grant Moore summary judgment on Counts III and IV. *See Russell*, 916 F. Supp. 2d at 645 (finding that the court's summary judgment grant "for the defendant on an excessive force claim under § 1983 require[d] dismissal of the state law claims as well").

## B. Counts 2, 5, 6, 7

The remaining Counts (2—False Arrest under § 1983; 5—Common Law False Imprisonment; 6—Unlawful Search under Va. Code Ann. § 19.2-59; and 7—Common Law Malicious Prosecution) turn on whether Moore had probable cause to arrest Joseph. Finding that several material factual issues are in genuine dispute, the court cannot grant summary judgment on these Counts.

### 1. Count 2 (False Arrest)

Probable cause is a "flexible, common-sense standard" for which the court employs a totality-of-the-circumstances approach. *Florida v. Harris*, 568 U.S. 237, 240, 245 (2013) (citing *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (cleaned up). A court must "look to the information available to the officer on the scene at the time, [and] apply an objective test to determine whether a reasonably prudent officer with that information would have thought that probable cause existed for the arrest." *Hupp*, 931 F.3d at 318. In other words, an officer's subjective intent in

making an arrest is irrelevant "as long as the circumstances, viewed objectively, justify" the arrest. *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004).

It is well-settled that "there is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause," *Street v. Surdyka*, 492 F.2d 368, 372–73 (4th Cir. 1974); *see United States v. Johnson*, 599 F.3d 339, 346 (4th Cir. 2010). While the determination of probable cause is a legal issue, a court cannot find probable cause as a matter of law if material facts surrounding an arrest remain unresolved. *See Gilliam v. Sealey*, 932 F.3d 216, 234 (4th Cir. 2019); *contra Caldwell v. Green*, 451 F. Supp. 2d 811, 818 (W.D. Va. 2006) ("[W]here facts are admitted, the court determines as a matter of law whether they amount to probable cause.").

Moore argues that he had probable cause to arrest Joseph for four distinct crimes under Virginia Law. (Mem. Supp. Mot. Summ. J. at 12–16.) The court addresses each in turn and, "[b]ecause the probable cause inquiry is informed by the contours of the offense at issue," looks to the relevant Virginia law to determine the scope of each offense. *Hupp*, 931 F.3d at 318 (cleaned up).

### i. Obstruction of Justice

Joseph was arrested and charged only with violating Virginia's obstruction of justice statute. *See* Va. Code Ann. § 18.2-460(A) (noting it is a Class-1 misdemeanor to "knowingly obstruct[] a . . . law-enforcement officer . . . in the performance of his duties"). Virginia courts have promulgated two elements to determine whether an individual's behavior rises to obstruction: (1) whether "the accused's actions did, in fact, prevent a law-enforcement officer

from performing his duties"; and (2) whether "the accused acted with an intent to obstruct—*i.e.*, prevent—an officer from performing his or her duty." *Maldonado v. Commonwealth*, 70 Va. App. 554, 564 (2019) (cleaned up). "Acts sufficient for an obstruction conviction 'may be either active or passive.'" *Id.* at 563 (quoting *Thorne v. Commonwealth*, 66 Va. App. 248, 255 (2016)). For obstruction purposes, the subject of a valid investigatory stop is "not required to assist the officer with his investigation, [but is] required to allow him to conduct it." *Id.* at 568 (citing *Thorne*, 66 Va. App. at 259). Put simply, "actions that merely frustrate a police officer's investigation, but do not 'oppose, impede, or resist' an officer's lawful efforts to conduct an investigation, do not constitute obstruction of justice as contemplated by Code § 18.2-460(A)." *Id.* at 569–70 (quoting *Ruckman v. Commonwealth*, 28 Va. App. 428, 431 (1998)).

Moore's primary justification—indeed, the basis for the magistrate's finding of probable cause—was that Joseph did not comply with an order to provide identification. (Mem. Supp. Mot. Summ. J. at 14.) That is incorrect as a matter of law; "fail[ure] to identify does not violate Virginia's obstruction statute, Va. Code Ann. § 18.2-460(A)." *Stout v. Harris*, No. 3:21-cv-468, 2022 WL 363873, at *5 (E.D. Va. Feb. 7, 2022) (citing *Ruckman*, 28 Va. App. at 429).

Joseph's refusal to provide his ID did not "obstruct" Moore's investigation, as that term is defined under Virginia law, because it did not "prevent the officer from performing his duty . . . ."[6] *Jones v. Commonwealth*, 141 Va. 471, 479 (1925). Indeed, police have long been

---

[6] There is a genuine question of material fact as to whether Joseph actually "refused" to provide his ID. Moore says that he twice demanded that Joseph produce his ID. Joseph claims that he responded by asking Moore *why* he had to produce ID, since he had done nothing wrong, but that he never *refused* to produce it. But the record makes clear that Joseph, despite being instructed to twice, never gave his ID to Moore. (*See* Joseph Decl. ¶ 17 (claiming that, after being cuffed and sat on the floor, "Moore conducted an unlawful search of [Joseph's] person and seized and searched [his] wallet which he had no legal right to do, and then disseminated the

- 20 -

aware, absent a stop-and-identify statute, that "refusal to identify does not fall within Virginia's obstruction of justice statute." *Stout*, 2022 WL 363873, at *5 (citing Crimes and Offenses Generally: Crimes Against the Administration of Justice, Op. Va. Att'y Gen. 02-082, 2002 WL 31777454 (Oct. 10, 2002) (concluding that "a law-enforcement officer conducting a lawful investigative stop may not arrest a suspect for obstruction of justice under § 18.2-460(A), when the suspect refuses to identify himself to the officer")).

Moore's reliance on *Wingate v. Fulford*, 987 F.3d 299 (4th Cir. 2021), for the proposition that his "valid investigatory stop of Joseph carried the right to require Joseph to provide identification" is misplaced. (Mem. Supp. Mot. Summ. J. at 14.) *Wingate* provides no such wholesale rule; in that case, the Fourth Circuit merely concluded that "a valid investigatory stop, supported by *Terry*-level suspicion, is a constitutional prerequisite to enforcing stop and identify statutes." *Wingate*, 987 F.3d at 310. But Roanoke County does not have such a statute.

Moore also contends that the magistrate's finding of probable cause on this basis supports the existence of probable cause. (*See* Mem. Supp. Mot. Summ. J. at 14.) While such evidence may be pertinent, "a magistrate's imprimatur does not conclusively establish that probable cause exists." *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 755 (E.D. Va. 2016). Here, there are unresolved questions of fact surrounding the magistrate's finding of probable cause, including whether Joseph, in fact, refused to provide identification and, relatedly, whether Moore falsified his testimony to obtain probable cause after failing to substantiate the arrest on another charge. Accordingly, the magistrate's finding of probable cause does not establish

---

information obtained as a result of the illegal search and seizure with Kroger employees . . . ."); Moore Decl. ¶ 9 ("I patted [Joseph] down and searched his outside pants pockets. I retrieved [Joseph]'s wallet from one of his pockets, which contained his driver's license.").)

Moore's probable cause as a matter of law given that this finding is shrouded by disputed questions of material fact.

Ultimately, probable cause is an objective determination, so the court examines the circumstances to decide whether any of Joseph's other actions would give rise to probable cause. *See Devenpeck*, 543 U.S. at 153–54. Specifically, the court considers whether Joseph's walking away from Moore, refusing to stop when ordered to, and resisting Moore's attempt to forcibly detain him in handcuffs, constituted obstruction.

Moore contends that probable cause arose at least in part from Joseph's active resistance—"straightening his left arm"—while Moore attempted to handcuff him.[7] (Moore Decl. ¶ 8.) Even if the court were to take Moore's statement as true, such slight physical resistance is likely not enough to constitute obstruction. While obstruction does not require "an actual or technical assault upon the officer," the subject of detainment must evince an intent to "prevent the officer from performing his duty, as to 'obstruct' ordinarily implies opposition or resistance by direct action . . . ." *Jones*, 141 Va. at 478–79 (cleaned up). Slight physical resistance that "merely renders the officer's task more difficult but does not impede or prevent the officer from" completing his duty does not rise to obstruction. *Ruckman*, 28 Va. App. at 429.

For example, Virginia's Supreme Court has held there was no obstruction under an analogous subsection of the same statute when a detainee "stiffened his arms and began

---

[7] There is also a genuine issue of material fact as to whether Joseph resisted in this manner. According to Joseph, he never straightened his arm and the only semblance of resistance was when he "repeatedly asked Moore why he was doing this to me . . . ." (Joseph Decl. ¶¶ 14–15.) The videos do not illuminate this point either.

pulling away" from an officer or when the detainee "walked slowly and pulled away" from the officer. *Jordan v. Commonwealth*, 273 Va. 639, 643–44, 648–49 (2007) (cleaned up). Here, too, Joseph may have been "less than cooperative and his conduct rendered Officer [Moore's] discharge of his duties more difficult," but he "did not impede or prevent Officer [Moore] from performing his tasks." *Id.* at 649. Based on the applicable Virginia law, no reasonable officer could have found probable cause based on Joseph's minor act of resistance.

Next, the court considers whether Joseph's flight from Moore after Moore told him to "stop" gives rise to probable cause for obstruction. "[A] suspect's flight, alone, does not constitute obstruction of a law-enforcement officer." *Lucas v. Commonwealth*, 75 Va. App. 334, 344 (2022). Joseph did not "flee" in the traditional sense; he simply walked away. But noncompliance with an officer's orders *during a legal investigatory stop* may in some circumstances give rise to obstruction. *See Thorne*, 66 Va. App. at 256–57; *Molinet v. Commonwealth*, 65 Va. App. 572, 575, 581 (2015). While it is undisputed that Moore ordered Joseph to "stop" as he walked toward Kroger's exit, the specific details of that exchange remain in dispute. The Videos are similarly unclear as to the sequence of Moore's "stop" order, his grabbing of Joseph's arm, and Joseph's turning back toward the officer on his way to the store exit.

In *Thorne*, an officer, during a valid *Terry* stop, asked the driver to roll down her window so that he could test the tint for compliance with Virginia law. 66 Va. App. at 257. The driver refused repeated orders to do so, asserting that she knew her rights and did not roll down her windows until nine minutes after the initial request. *Id.* The court held that such noncompliance "did more than merely make the officer's tasks more difficult[; it] prevented his efforts to investigate the suspected window tint violation" and thus violated § 18.2-460(A).

- 23 -

*Id.* at 256–57.

Here, the court notes that Moore's alleged refusal to identify himself was not a necessary element to any underlying disorderly conduct crime, unlike the refusal to allow the officer to investigate the tinted window in *Thorne. See id.* But a properly instructed jury may find that a reasonable officer could find probable cause based on Joseph failing to comply with and ignoring Moore's orders during a *Terry* stop. Here, as in *Thorne*, Moore had reasonable suspicion to detain Joseph to confirm or dispel his suspicions that criminality was afoot. *Id.* While Joseph was not required to assist Moore in his investigation, he was required to submit to his lawful order to "stop" so he could conduct a brief investigation before letting him go (or arresting him, if that were the indicated outcome). Joseph leaving the scene would have effectively nullified Moore's investigation because, if Moore determined that Joseph committed a crime, Joseph may have by then evaded the officer's grasp. But there is a genuine question of material fact as to whether Moore could have still performed his duties, as well as the extent of Joseph's alleged noncompliance, which preclude the court from finding probable cause as a matter of law.

Ultimately, "[u]nder the clear wording of Code § 18.2-460(A), the trier of fact determines if [Joseph's] repeated refusals to obey the officer's commands were without just cause." *Thorne*, 66 Va. App. at 258. Finding that there are genuine questions of material fact as to whether Moore had probable cause to arrest Joseph for obstruction outside of mere failure to produce identification, the court cannot grant the officer's request for summary judgment on these claims.

### ii. Other Crimes under Virginia law

Again, because probable cause is an objective standard, the court considers the other crimes for which Moore asserts he had probable cause: disorderly conduct under Va. Code Ann. § 18.2-415; criminal trespass under Va. Code Ann. § 18.2-119; and using abusive language under Va. Code Ann. § 18.2-416. Factual issues preclude a finding of probable cause as a matter of law for any of them.

To start, Moore asserts that he had probable cause for disorderly conduct under § 18.2-415. "The essential elements of a disorderly conduct charge include the specified *mens rea* (intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof) and a concomitant *actus reus* (public conduct tending to cause acts of violence under subsection A . . . )." *Battle v. Commonwealth*, 50 Va. App. 135, 139 (2007) (cleaned up).

There is a genuine question of material fact as to whether a reasonable officer in Moore's shoes would believe he had probable cause to believe that Joseph had "engaged in conduct having a direct tendency to cause acts of violence . . . ." *Id.* at 141 (cleaned up). Moore only saw Joseph causing a disturbance by being loud, appearing visibly upset, and making emphatic hand-and-arm gestures. Moore also observed, and the Videos support, that "employees and customers alike were staring at [Joseph] and seemed to be nervous about his behavior." (Moore Decl. ¶ 5.) The available Videos lack audio, so the intensity of Joseph's voice throughout the encounter remains a question of fact not borne out by the record. Indeed, the entirety of what Moore observed as he arrived, and the contents of his conversation, if any, with Tillery, Sharpe, or anyone else before arresting Joseph remain unresolved by the record and must be resolved by the trier of fact.

Additionally, the record is devoid of any specific description of words that would constitute "threatening remarks" or that Joseph "uttered [any] words that would reasonably incite a breach of the peace, or made [any] threatening movements toward [Moore]." *Ford v. City of Newport News*, 23 Va. App. 137, 144 (1996). Resolutions of those questions could show that Moore had probable cause, but when viewed in the light most favorable to Joseph, the court cannot say conclusively that probable cause existed for disorderly conduct. Whether Joseph's conduct—*i.e.*, his words and how he was saying them, taken together with his animated body language—gave Moore probable cause that Joseph engaged in "conduct having a direct tendency to cause acts of violence by the person or persons at whom, individually, such conduct is directed" is a factual question incapable of resolution at this juncture. Va. Code Ann. § 18.2-415(A)(1).

For these reasons, there are genuine issues of material fact as to whether Moore had probable cause to arrest Joseph for disorderly conduct under Va. Code Ann. § 18.2-415.

Moore next claims that he had probable cause to arrest Joseph for criminal trespass in violation of Va. Code Ann. § 18.2–119. "[T]he Virginia criminal trespass statute has been uniformly construed to require a willful trespass." *Reed v. Commonwealth*, 6 Va. App. 65, 70 (1988). If Joseph had a good-faith belief that he was allowed to be at the Kroger, that would negate the requisite criminal intent. *See id.* At this stage, the record is not apparent as to when exactly Tillery told Joseph to leave and whether Joseph heard her order; in other words, the court cannot determine the dispositive question—that Joseph *willfully* trespassed—on this record. *See id.* at 70–71.

Further, the facts are unclear as to whether Moore had probable cause to arrest Joseph

for trespass at the time he states he arrested Joseph, regardless of what Moore may have learned later. Tillery claims that she told Joseph to leave before Moore arrived and that Joseph refused her instruction. (Tillery Decl. ¶¶ 4–5; *see also* Sharpe Decl. ¶ 5.) After Moore handcuffed Joseph and sat him on the ground, Tillery indicated to Moore that she wanted Joseph "trespassed." (Moore Decl. ¶ 11.) Indeed, Kroger took Joseph's information from Moore for the purpose of adding it to a list of people banned from entering the store—a "No trespass ban." (Sharpe Decl. ¶ 7; Moore Decl. ¶ 11.) But Moore says that Joseph was under arrest when he handcuffed him and had him sit on the floor, and the record is devoid of any evidence that Moore knew, at the time he arrested Joseph, of Tillery's preceding demand for Joseph to leave the store. (Moore Decl. ¶ 9.) Moreover, his discussion with Tillery about Kroger banning Joseph from the store *in the future* also happened *after* he had arrested Joseph.

Given the material factual issues surrounding the alleged trespassing that must be resolved by the trier of fact, summary judgment is not appropriate on those grounds.

Finally, Moore claims he had probable cause to arrest Joseph for "using abusive language" under Va. Code Ann. § 18.2-416. "The Supreme Court of Virginia has limited the sweep of § 18.2-416 to abusive language that has 'a direct tendency to cause acts of violence by the person to whom, individually, [the language is] addressed.'" *United States v. Bartow*, 997 F.3d 203, 206 (4th Cir. 2021) (quoting *Mercer v. Winston*, 214 Va. 281, 284 (1973)). "As such, the statute only criminalizes 'personal, face-to-face, abusive and insulting language likely to provoke a violent reaction and retaliation.'" *Id.* (quoting *Mercer*, 214 Va. at 284).

In *Bartow*, the Fourth Circuit overturned the defendant's conviction for using an offensive racial epithet toward an African-American man in a store, along with other

"offensive and bizarre" remarks. *Id.* at 210–11. While recognizing the offensive nature carried by the racial epithet, the court held that its use did not violate § 18.2-416 because "no witness testified to, and the video [did] not reveal any evidence of, the likelihood of a violent response from anyone in reaction to Bartow's epithet . . . ." *Id.* at 210.

Here, as in *Bartow*, there is no evidence that Joseph's words were likely to provoke an immediate violent reaction, or even that they constituted a "direct personal insult[.]" *Id.* at 207. The store manager and other Kroger employees stayed behind the customer service counter, appearing to calmly await the arrival of police. (*See* Customer Care 2 Video.) In fact, only Joseph appears to have lost his temper. Though Moore witnessed customers and employees that appeared nervous at Joseph's loud speech, nervousness falls well short of abusive language that has "a direct tendency to cause acts of violence" by any of the people to whom the speech is addressed. *Bartow*, 997 F.3d at 206.

Kroger staff claim that Joseph used profanity, but the court is obligated to view the facts in the light most favorable to Joseph, who does not concede this point. But even if he did use foul language, the record is devoid of any indication that this profanity constituted "personal, face-to-face, abusive and insulting language likely to provoke a violent reaction and retaliation." *Id.* Moreover, if the odious racial epithet used in *Bartow* was not enough by itself to constitute "fighting words" because no immediate violent response appeared imminent, it is likely that neither was Joseph's unspecified profanity. *Id.* at 207. To the extent any profanity may or may not have been used, that is a factual question that the court cannot resolve on this record.

In sum, there are genuine issues of material fact as to whether Moore had probable

cause to arrest Joseph for using abusive language under Va. Code Ann. § 18.2-416. Summary judgment is not appropriate on this record.

For all these reasons, the court will deny Moore's motion for summary judgment as to Count 2.[8]

### 2. Counts 5 (False Imprisonment), 6 (Va. Code Ann. § 19.2-59), and 7 (Malicious Prosecution)

The remaining state law claims—Common Law False Imprisonment, Unlawful Search under Va. Code Ann. § 19.2-59 and Common Law Malicious Prosecution—turn on whether Joseph's arrest was lawful. The court's finding that there are genuine issues of material fact such that Moore cannot establish probable cause as a matter of law also precludes summary judgment on each of these related state law claims. *See Cromartie v. Billings*, 298 Va. 284, 306–08 (2020).

### C.    Procedure Moving Forward

Based on the court's decision, as outlined above, part of this case will proceed to trial. The court will take this time to recite the many procedural mishaps by Joseph, who is now proceeding *pro se*, and direct him to cure them; if he does not, the court will consider sanctions up to dismissal of the case under Federal Rule of Civil Procedure 41(b) for his repeated disregard for the court's orders. *See Attkisson v. Holder*, 925 F.3d 606, 625 (4th Cir. 2019); *Ballard v. Carlson*, 882 F.2d 93, 95–96 (4th Cir. 1989).

Since at least early August, Joseph has engaged in *ex parte* communications with court

---

[8] Curiously, Moore has not asserted qualified immunity as an alternative defense for Count 2 after having done so for Count 1. "Qualified immunity is an affirmative defense and . . . 'the burden of pleading it rests with the defendant.'" *Crawford-El v. Britton*, 523 U.S. 574, 587 (1998) (quoting *Gomez v. Toledo*, 446 U.S. 635, 639–41 (1980)). The court, therefore, cannot address whether Moore has a meritorious qualified immunity defense—at least at this stage. *Cantrell v. McCoy*, 553 F. Supp. 3d 295, 305 n.5 (W.D. Va. 2021).

staff. These took the form of e-mails to various members of the court's staff as well as clerks of another Judge's chambers. According to Joseph's cryptic e-mails—as the court has pieced them together—he is currently working "overseas" on a "Government Assignment," which is a "critical mission" at the "US Airforce Military Base" in "the United [Arab] Emirates." (E-mails from Joseph, Plaintiff, to the Courtroom Deputy (Aug. 2023) (on file with the court) (cleaned up).) By virtue of his situation, Joseph asserts that he can only communicate by e-mail; as such, he has asked the court via e-mail to: (1) serve a settlement demand on opposing counsel; (2) extend the deadline to file a supplemental response to this summary judgment motion, which the court granted but Joseph nevertheless did not file; and (3) suspend the case until he returns from his trip overseas. (*See id.*)

As the court has informed him repeatedly, Joseph is not to engage in any more *ex parte* communications with the court. (ECF Nos. 45, 46.) Such communications prejudice the opposing party and undermine the integrity of the proceedings; when a plaintiff continuously disregards a court's orders not to engage in such communications, he engages in contumacious conduct that gives rise to involuntary dismissal. *See, e.g.*, *Ladien v. Astrachan*, 128 F.3d 1051, 1056–57 (7th Cir. 1997); *Wells v. Gourmet Servs.*, 748 F. App'x 235, 241 (11th Cir. 2018); *Leybinsky v. Iannacone*, No. 97-cv-5238, 2000 WL 863957, at *3 (E.D.N.Y. June 21, 2000); *Asr v. Giftos*, No. 3:21-cv-00670, 2023 WL 4111405, at *7 (W.D.N.C. June 21, 2023).

For Joseph to keep his lawsuit from being dismissed, he must comply with the court's previous Orders and file any motion, including one to stay the case until he returns to the United States, in the proper manner. (*See* ECF Nos. 45, 46.) As a *pro se* litigant, Joseph can mail

motions to the court.[9] Alternatively, and as the court has explained to him previously, he can e-mail a motion seeking e-filing privileges to the clerk who will docket it on his behalf. (ECF No. 45.) If he does so, he can subsequently file a formal motion seeking to suspend the trial until he returns to the United States. If Joseph sends another e-mail to any member of court staff that is not a motion seeking permission to e-file, the court will have no choice but to sanction him, and, depending on the circumstances, may dismiss the matter for his continuous disregard of court orders. *See* Fed. R. Civ. P. 41(b).

Additionally, given the vague answers Joseph has provided the court discussing his whereabouts and when he may be able to return to the United States, Joseph must provide the court with that information. Specifically, Joseph must advise the court in writing about the specific nature of his "deployment" in the United Arab Emirates and when he expects to return to the United States. And he must submit documentation from his employer confirming any specific representations made in that letter about the nature and duration of that engagement.  He must do this within 30 days of the date that this Memorandum Opinion and the accompanying Order are issued. This writing must not take the form of an *ex parte* communication—that is, it must be properly filed with the court either by mail or by e-filing.[10]

The court is not unsympathetic to the circumstances that have caused Joseph to go from represented to unrepresented by counsel. Nevertheless, the reality is that Joseph is now proceeding *pro se* despite the court's generous extensions of time for him to find a new

---

[9] The court is dubious of Joseph's claims that e-mail is his only form of communication. Surely an individual working at a United States Air Force Base would have access to a mailing service.

[10] Again, to e-file, Joseph must first seek leave of the court through a proper motion. If he e-mails *anything* to court staff that is not a motion for e-filing privileges, it will be deleted.

attorney. (*See* ECF No. 32.) While the court is mindful that it must afford some deference to *pro se* litigants like Joseph, he is nevertheless "subject to the time requirements and respect for court orders without which effective judicial administration would be impossible." *Ballard*, 882 F.2d at 96. In other words, Joseph is not immune from involuntary dismissal if he continues to flout the court's orders. *See id.* The court has bent quite far to accommodate Joseph to date; it will not risk breaking by continuing to allow him to play by his own rules.

## IV.   CONCLUSION

For the foregoing reasons, Moore's summary judgment motion will be granted as to Counts 1, 3, and 4 but denied as to Counts 2, 5, 6, and 7.

Joseph will also be directed to comply with the accompanying Order in which he will be directed to respond to the court's inquiries.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record, and e-mail a copy of both to Mr. Joseph.

**ENTERED** this 28th day of September, 2023.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE